DECISION AND JOURNAL ENTRY
Appellants, Sarah Peterman ("Ms. Peterman") and Robert Creel, Sr. ("Mr. Creel"), appeal the decision of the Summit County Court of Common Pleas, Juvenile Division, granting appellee, the Summit County Children Services Board ("CSB"), permanent custody of their child, Robert Creel, Jr. ("Robert"). We affirm.
 I.
Mr. Creel and Ms. Peterman are the parents of Robert, who was born on September 26, 1998. CSB became involved with Robert approximately two days after his birth because the hospital had reported that it had concerns regarding Ms. Peterman's interaction with the baby. Initially, CSB was providing supportive services to the family through its Family Preservation Program. As standard procedure, CSB had Ms. Peterman and Mr. Creel sign releases so that CSB could perform criminal background checks. From these checks, CSB learned that Mr. Creel had pleaded guilty to attempted rape on February 26, 1982, which offense had been committed against a three year old girl. Subsequently, CSB asked Mr. Creel to complete a sexual offender assessment at Portage Path Behavioral Health and comply with any treatment recommendations. Ms. Christine Sovel, a licensed social worker for Summit County Children Services, testified that because Mr. Creel reported that he would not become involved in the recommended treatment program, CSB filed for protective supervision on January 27, 1999. The juvenile court granted CSB protective supervision and ordered Mr. Creel to move out of the family home immediately. Thereafter, CSB received a referral that Mr. Creel had violated this order, and consequently, CSB moved for emergency temporary custody of Robert. The juvenile court granted this motion and awarded CSB emergency temporary custody.
On April 12, 1999, CSB filed a complaint, alleging that Robert was a dependent child, as defined in R.C. 2151.04. On June 4, 1999, Robert was adjudicated dependent and placed in temporary custody of CSB. On December 1, 1999, CSB filed a motion for permanent custody of Robert. A hearing was held on February 9, 2000, during which both Mr. Creel and Ms. Peterman were present and represented by counsel. In the morning of February 9, 2000, Dr. Avery Zook, a licensed psychologist at Portage Path Behavioral Health, testified that he interviewed Mr. Creel on four occasions as part of the child sexual offender assessment ordered by CSB, and based on those four interviews and records supplied by CSB, Dr. Zook opined that Mr. Creel was at a "moderate to high risk of reoffending." Mr. Creel's trial counsel vigorously objected to Dr. Zook's testimony. The juvenile court overruled these objections. In addition to Dr. Zook, Tammy Knezevich, a caseworker for Community Support Services ("CSS"), testified in the morning. That afternoon, the juvenile court sua sponte
declared a mistrial.
On February 14, 2000, the parties filed a motion for reconsideration, requesting that the trial court reconsider its decision to declare a mistrial. Subsequently, the trial court held a hearing on March 2, 2000. Thereafter, the trial court granted the motion for reconsideration and vacated the order of a mistrial. On March 23, 2000, the permanent custody hearing resumed. In addition to other witnesses, both Mr. Creel and Ms. Peterman testified. After hearing the testimony, the guardian adlitem recommended granting permanent custody in favor of CSB in her report. In a judgment entry dated April 6, 2000, the trial court granted CSB permanent custody of Robert. This appeal followed.[1]
 II.
Ms. Peterman asserts seven assignments of error, and Mr. Creel asserts four assignments of error. We will discuss each in due course. Ms. Peterman's first, second, third, and fifth assignments will be consolidated along with Mr. Creel's third assignment of error to facilitate review. Then, we will address Ms. Peterman's remaining assignments of error, consolidating her fourth and seven assignments of error, followed by Mr. Creel's remaining assignments of error.
 A. Ms. Peterman's First Assignment of Error THE TRIAL COURT ABUSED ITS DISCRETION IN IGNORING OR FAILING TO FOLLOW THE STATUTORY REQUIREMENTS IN THE CONSIDERATION OF THE MOTION FOR PERMANENT CUSTODY FILED BY CHILDREN SERVICES BOARD.
 Ms. Peterman's Second Assignment of Error THE TRIAL COURT ERRED IN ITS DISCRETION [sic] TO AWARD PERMANENT CUSTODY OF THE CHILDREN AS SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 Ms. Peterman's Third Assignment of Error THE TRIAL COURT ERRED IN ITS DISCRETION [sic] TO AWARD PERMANENT CUSTODY OF THE CHILDREN AS THERE WAS NOT SUFFICIENT EVIDENCE TO SUPPORT THE DECISION.
 Ms. Peterman's Fifth Assignment of Error THE TRIAL COURT ERRED BY GRANTING CSB'S MOTION FOR PERMANENT CUSTODY AS PERMANENT CUSTODY WAS NOT IN THE CHILD'S BEST INTERESTS.
 Mr. Creel's Third Assignment of Error THE TRIAL COURT'S ORDER GRANTING PERMANENT CUSTODY OF ROBERT CREEL JR. TO THE CHILDRENS SERVICES BOARD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In these assignments of error, Ms. Peterman and Mr. Creel assert that the trial court's decision to grant CSB permanent custody of Robert was against the manifest weight of the evidence, as it was not in Robert's best interest. We disagree.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of fact [of the trial court]."Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
Termination of parental rights is an alternative of last resort, but is sanctioned when necessary for the welfare of a child. In re Wise (1994), 96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, who is neither abandoned nor orphaned, it must find by clear and convincing evidence that (1) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C.2151.414(D), and that (2) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E). See R.C. 2151.414(B)(1); see also, In re William S. (1996), 75 Ohio St.3d 95,99. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb
(1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
When determining whether a grant of permanent custody is in the child's best interest, the juvenile court should:
[C]onsider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem [sic], with due regard for the maturity of the child;
(3) The custodial history of the child * * *;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 (5) Whether any of the factors in divisions (E)(7) to (12) of this section apply in relation to the parents and child.
R.C. 2151.414(D)(1)-(5). When determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the juvenile court must find by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents. In re William S.,75 Ohio St.3d at 101. Those factors are:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties[;]
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time * * *[;]
 (3) The parent committed any abuse as described in section 2151.031 [2151.03.1] of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 (6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.21, 2907.22, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321
[2907.32.1], 2907.322 [2907.32.2], 2907.323 [2907.32.3], 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161 [2923.16.1], 2925.02, or 3716.11 of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
 (7) The parent has been convicted of or pleaded guilty to one of the following:
 (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
 (11) The parent has had parental rights involuntarily terminated pursuant to section 2151.353
[2151.35.3], 2151.414 [2151.41.4], or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child.
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 (13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 (15) The parent has committed abuse as described in section 2151.031 [2151.03.1] of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
 (16) Any other factor the court considers relevant.
R.C. 2151.414(E). The juvenile court should consider all relevant evidence when making such a determination. R.C.2151.414(E). When a juvenile court finds by clear and convincing evidence that one of the enumerated factors in R.C. 2151.414(E) is present, the court must then conclude that the child cannot be placed within a reasonable time or should not be placed with the parent. In re Thorn (Feb. 16, 2000), Summit App. No. 19597, unreported, at 8.
In the present case, we find that the trial court's decision to grant permanent custody of Robert to CSB was not against the manifest weight of the evidence. During the hearing, Tammy Knezevich, a licensed social worker employed as a community living specialist with CSS, testified that she helps people live independently in the community. She has been Ms. Peterman's case manager since June 1993 and has visited Ms. Peterman approximately every two weeks during that time. Ms. Knezevich is aware that Ms. Peterman suffers from depression with psychotic features which requires medication, and cries frequently. She described Ms. Peterman's relationship with Mr. Creel as codependent, in that Ms. Peterman has a need to be loved, and depends significantly on Mr. Creel. She further noted that Ms. Peterman seems happy with Mr. Creel.
At a Coordinated Service Team meeting on July 29, 1999, Ms. Knezevich expressed concerns regarding Ms. Peterman's home being a safe environment for a toddler because there was a lot of clutter, such as televisions and electrical cords lying about. She also stated that Ms. Peterman needs a lot of direction with the spontaneous situations that may arise with a child. However, Ms. Peterman pays her own bills, appropriately furnishes her home, and keeps an adequate supply of food. She believes that Ms. Peterman has made progress in the area of independent functioning; however, as Ms. Peterman's mental illness is an ongoing issue and will remain so for the rest of her life, there is no plan to stop working with her.
Ms. Knezevich further related that when Ms. Peterman was notified that Mr. Creel had sexually molested a three year old child, she became extremely upset. Ms. Knezevich explained the term "pedophile" to her because she had questions about Mr. Creel's conviction. Ms. Knezevich testified that Ms. Peterman reported to her that she does not feel Mr. Creel is a threat to Robert, reasoning that Mr. Creel served his time in prison and is cured.
Christine Sovel, a licensed social worker for Summit County Children Services, testified that CSB became involved two days after Robert's birth on September 26, 1998. The birth hospital had contacted CSB because of concerns regarding Ms. Peterman's interaction with the baby, as she became easily frustrated, had to be reminded to feed him, and had difficulty comforting the baby when he was crying. According to Ms. Sovel, CSB was initially trying to provide supportive services to the family through its Family Preservation Program. As a standard procedure, CSB asked for and received signed releases for criminal background checks of both parents. Through this check, CSB learned that Mr. Creel had pleaded guilty to attempted rape of a three year old child. Ms. Peterman had no criminal record. Upon learning of his conviction, Ms. Peterman became hysterical. Subsequently, CSB requested that Mr. Creel complete a sexual offender assessment at Portage Path Behavioral Health and told him that he was not to be alone with Robert.
CSB referred Mr. Creel to Dr. Avery Zook, a licensed psychologist at Portage Path Behavioral Health who specializes in working with adults who sexually abuse children. Dr. Zook interviewed Mr. Creel on four occasions as part of the sexual offender assessment. Dr. Zook learned that Mr. Creel had also sexually abused a fifteen year old girl when he was twenty-one years old. Based on the four interviews, Dr. Zook opined that Mr. Creel was at a "[m]oderate to high risk of reoffending." In making this assessment, Dr. Zook considered eight factors which indicate a sexual offender's likelihood to recidivate: (1) his victim was extremely young (three years old), (2) the offenses were serious (performing cunnilingus on the child and having the child perform fellatio on him), (3) Mr. Creel had failed two halfway house treatment programs, (4) he kept his conviction a secret from Ms. Peterman, thus preventing his friends and family from looking for warning signs of recidivism, (5) Mr. Creel failed to see a three year old as an inappropriate sexual partner, (6) his two victims were at two different developmental stages (three and fifteen years of age), (7) Mr. Creel demonstrated minimal victim empathy, and (8) he abuses alcohol which generally lowers one's inhibitions. Dr. Zook further opined that he had serious concerns about a sixteen month old child's safety in Mr. Creel's home.
Based on this assessment, Dr. Zook recommended that Mr. Creel participate in a counseling program held in Barberton, Ohio. Ms. Sovel testified that due to Mr. Creel's lack of cooperation in participating in the sexual offender treatment program, CSB filed for protective supervision on January 27, 1999. The juvenile court granted CSB protective supervision and ordered Mr. Creel to move out of the home immediately and have no contact with Robert. Ms. Sovel testified that CSB received a referral that Mr. Creel had violated this order. Consequently, CSB moved for and was granted emergency temporary custody of Robert. Since then, Robert has been in the continuous custody of CSB.
In March 1999, CSB formulated case plans for Ms. Peterman and Mr. Creel, working toward the goal of reunification. Later, in February 2000, the case plans were revised; however, the case plan objectives remained consistent. Ms. Sovel testified that Ms. Peterman's case plan included participation in a support group for significant others of sex offenders. Ms. Peterman was unable to achieve this goal because her participation in the group hinged upon Mr. Creel's participation. She was also required to maintain involvement with Community Support Services, which objective she achieved. Ms. Peterman was also to participate in couples counseling to address trust issues in their relationship. Ms. Sovel testified that although Ms. Peterman and Mr. Creel initially attended couples counseling through Family Services, they were terminated from the program for lack of participation. Ms. Peterman testified that, instead, she and Mr. Creel went to their pastor to address their relationship issues. She also successfully completed the recommended parenting classes.
Ms. Sovel testified that Mr. Creel's case plan included attending the sexual offender treatment program at Portage Path Behavioral Health as recommended by Dr. Zook. She testified that Mr. Creel did not comply with this case plan objective and has not attended any type of counseling session since May 1999. Mr. Creel was to participate in couples counseling, but as previously noted, he only attended a few sessions before being terminated from the program for lack of participation. Similarly, Mr. Creel occasionally attended parenting classes, but never completed the program.
CSB also requested that Mr. Creel complete a drug and alcohol assessment as part of his case plan and follow through with any treatment recommendations. Victoria Kaplan, a licensed clinical counselor at Morley Health Center who focuses on treating chemical dependency, did the intake assessment of Mr. Creel. Ms. Kaplan testified that Mr. Creel admitted to consuming a case of beer the night before the assessment. Relying on the Diagnostic and Statistical Manual of Mental and Emotional Disorders, Ms. Kaplan diagnosed Mr. Creel as alcohol dependent with physical dependence. Although Mr. Creel completed the assessment, he only attended one of six individual counseling sessions, attended four of twelve group sessions, and did not attend any aftercare sessions. Ms. Sovel drove Mr. Creel to his first session and inquired whether transportation to the program would be an issue. Mr. Creel indicated that transportation was not a problem, but later blamed his poor attendance on a lack of transportation. Further, Ms. Kaplan opined that it would be difficult for Mr. Creel to abstain from alcohol use on his own because of the intensity of his dependence and his minimal coping skills.
The case plan for Robert included having his basic needs met. He has adjusted well to his foster home and has no special needs.
Ms. Sovel testified that Ms. Peterman had visitation twice per week with Robert and that Mr. Creel had visitation once per week. She observed seven visits between Ms. Peterman and Robert and stated that Ms. Peterman's interaction with the child has improved. Initially, Ms. Peterman was content to sit back and watch Robert play, and case aides had to give her some direction and help her identify age-appropriate toys. In more recent visits, Ms. Sovel noted that Ms. Peterman has improved in her interaction with Robert and is able to identify age-appropriate toys, get down on the floor and play with him, and talk with him. Ms. Sovel expressed concern that Ms. Peterman has difficulty keeping up with Robert because it is physically difficult for her to get up, but that she makes the effort despite this difficulty. At the end of the visits, Robert separates easily and goes directly to his foster mother. Lastly, Ms. Sovel testified that Mr. Creel and Ms. Peterman indicated that they plan to remain a couple and work toward having Robert returned to their care.
On cross-examination, Ms. Sovel admitted that the family home was a safe and stable environment for a child and that during the six months that Robert was in the home, his nutritional, clothing, medical, and basic needs were fully met. She further stated that CSB has not discovered any other criminal convictions or received any indication of any kind of criminal activity, in which Mr. Creel was involved. She stated that Ms. Peterman was responsive to suggestions and was generally compliant.
Mr. Creel testified that he served fifteen years in prison for the attempted rape conviction and was released in December 1996. He stated that he went to halfway houses on two separate occasions, but was subsequently returned to prison. The second halfway house was for sexual offenders only, but Mr. Creel failed out of the program. He feels that prison kept him out of trouble and that he is rehabilitated. He denied engaging in sexual acts with children since being released.
He feels he has a good relationship with Ms. Peterman and did not tell her about his conviction because he was afraid of hurting her and losing her.
Mr. Creel explained that he did not go to the treatment program at Portage Path Behavioral Health, which would require him to travel from his home in Akron to Barberton, because he had no transportation and did not know that CSB would drive him. He disclosed that he felt it was double jeopardy to force him to go to the program. He admitted that he took baths naked with his son. Mr. Creel stated that although it was reasonable for CSB to be concerned about his taking baths nude with his six-month old son, he explained that he was always under Ms. Peterman's supervision. Further, although he admitted to consuming five sixteen-ounce mugs of beer per day and considers himself an alcoholic,[2] he would not admit that alcohol is a problem for him because he believes that he can control it.
Ms. Cora Mildred Wade and Ms. Deborah Austin testified on behalf of Ms. Peterman. Ms. Wade, a neighbor, has been friends with Ms. Peterman for approximately ten years. Ms. Peterman used to baby-sit Ms. Wade's grandchildren and did an excellent job. Ms. Wade has observed both parents with Robert and testified that the parents and the child had a close bond. She testified that Ms. Peterman has competently cared for Robert, even when Mr. Creel was removed from the house by CSB. Ms. Peterman kept Robert clean, well-fed, and well-dressed. She also noted that Ms. Peterman has a support network nearby to assist her. Ms. Wade also testified that Ms. Peterman has made progress in learning how to care for Robert. She does not need to repeat instructions to Ms. Peterman. Ms. Wade testified that she has no doubt that Ms. Peterman loves her baby, as evidenced by walking two to three miles to visit Robert when she had no other transportation. Ms. Wade opined that Ms. Peterman would be a really good mother and can keep up with the demands of an active child.
Regarding Mr. Creel's conviction, Ms. Wade testified that based on her observation of Mr. Creel with Robert, she believes that he would not sexually abuse another child and that she would feel comfortable leaving her grandchildren in Mr. Creel's care. Ms. Wade said that she was not aware of the parents ever violating the court order, requiring Mr. Creel to vacate the home. She explained that when Mr. Creel needed to come to the house, he would call Ms. Peterman and schedule an appointment; Ms. Peterman would then take the child to Ms. Wade's or another neighbor's house to be watched.
Similarly, Ms. Austin testified that she is Mr. Creel's sister and had the opportunity to observe both parents interact with Robert. She stated that both parents adequately cared for Robert, but sometimes needed assistance. Ms. Austin explained that Ms. Peterman was always willing to learn more about caring for Robert. She witnessed Ms. Peterman walking through snow storms to visit Robert when CSB had temporary custody. Ms. Austin guaranteed that she would personally be available to help Ms. Peterman and Mr. Creel with Robert if they needed help.
Ms. Peterman testified that she graduated from high school in the special learning section for students. Ms. Peterman became involved with CSS after she had a nervous breakdown, which was caused by her former husband physically abusing her. She suffers from severe depression with schizoaffective disorder, which requires her to take medication. Since she has been on medication, she is stable.
Ms. Peterman met Mr. Creel when they both lived in the same apartment complex. As their relationship progressed, they talked about having a child. Upon learning that she was pregnant, Ms. Peterman voluntarily attended parenting classes. She testified that after the baby was born, she could not understand why he kept crying.
Although Ms. Peterman knew that Mr. Creel had been in prison, she thought he had been convicted of other offenses, like theft. When she learned that he had sexually abused a three year old girl, she became upset. She stated that she understood why Mr. Creel did not tell her about his conviction and addressed the trust issues initially with CSB and then with her pastor. She believes that they have improved their communication with each other. She also stated that if she had known about the conviction for attempted rape, she would not have had a baby with him, at least not immediately. Ms. Peterman further testified that Mr. Creel expressed remorse for hurting the little girl. She believes that Mr. Creel is not a risk to Robert because Mr. Creel loves him and would protect him. Ms. Peterman also testified that they never violated the court's order requiring Mr. Creel to have no contact with Robert. She stated that she would remove Robert from the home if Mr. Creel needed access.
Ms. Peterman testified that she does not feel Mr. Creel needs to attend sexual offender classes because he told her that he had completed counseling in prison (despite his testimony during the hearing to the contrary) and because he had not reoffended. She also attended some of the counseling sessions with Mr. Creel and reported that Dr. Zook acted unprofessionally and expressed animosity toward Mr. Creel. Further, Ms. Peterman believes Mr. Creel has made progress in addressing his alcohol problem, as she was able to get him to abstain from drinking hard liquor. Despite the fact that the expert testified that Mr. Creel had alcohol dependency, Ms. Peterman does not feel that his alcohol consumption is a problem.
Ms. Peterman testified that she trusts Mr. Creel and would allow him to bathe unsupervised with Robert. However, when asked what she would do if the court returned Robert to her care on the condition that Mr. Creel take no baths with Robert, she stated that she would comply with the condition. When asked how she would react if the court granted her custody of Robert on the condition that Mr. Creel was to leave the home, she stated that she did not know how to respond.
Ms. Peterman testified that she was sexually abused by her stepfather between the ages of five and fifteen and that she knows that sexual abuse can occur without the child being physically injured. She stated that if anyone molested her son, she would have him arrested. She believes that it is in Robert's best interest to have both parents in the home; however, if that is not possible, she believes that she is physically and emotionally capable of caring for her son.
Lastly, Susan Vogel, Robert's guardian ad litem, testified that she has never met Robert and has never seen the parents interact with him. She testified that she was not concerned with how the parents were actually caring for Robert, but rather, with how Mr. Creel was following through with his sexual offender treatment. In her report, Ms. Vogel stated that she was concerned that Mr. Creel seemed reluctant to realize the enormity of the sexual offender issue. Ms. Peterman's mental health issues and strong bond with Mr. Creel were also concerns. Ms. Vogel noted that CSB and CSS do not believe that Ms. Peterman can raise Robert on her own. Ms. Vogel recommended that it is in the best interest of Robert to grant permanent custody to CSB.
As a result of the evidence presented at the hearing, the juvenile court determined that Robert could not be returned or should not be returned to Mr. Creel and Ms. Peterman within a reasonable time and that it was the in Robert's best interest to grant permanent custody to CSB. In making this decision, the juvenile court found that Mr. Creel had continuously failed to address the problems that caused the removal of his child and expressed an unwillingness to do so. The court also found that Mr. Creel did not utilize the resources that were made available to him and demonstrated a lack of commitment toward Robert by failing to comply with his case plan. The court also noted that the father pleaded guilty to attempted rape of a three year old child. The court further found that Ms. Peterman disagreed with the experts and chose to support Mr. Creel's decision to refuse treatment, rather than look out for Robert's best interest by insisting on Mr. Creel attending the treatment sessions. The court cited Mr. Creel's alcoholism and Ms. Peterman's severe depression as concerns. Additionally, the juvenile court found Robert had no adjustment problems when placed in foster care and has no special needs. Robert separates easily from Ms. Peterman at the end of a visit and has been in the continuous custody of CSB since March 1999. Based on the foregoing, the juvenile court determined that the grant of permanent custody to CSB was in Robert's best interest.
After thoroughly reviewing the entire record, this court concludes that the juvenile court's finding that a grant of permanent custody to CSB was in Robert's best interest was not against the manifest weight of the evidence. Accordingly, Ms. Peterman's first, second, third, and fifth assignments of error are overruled, and Mr. Creel's third assignment of error is overruled.
 B.
Ms. Peterman's Remaining Assignments of Error
 1. Sixth Assignment of Error THE GUARDIAN AD LITEM FAILED TO FAITHFULLY DISCHARGE HER DUTIES AS THERE WAS NO INDEPENDENT INVESTIGATION PERFORMED AND THE TRIAL COURT ERRED BY CONSIDERING HER REPORT.
Ms. Peterman asserts that the trial court erred by considering the guardian ad litem's report because the guardian ad litem failed to faithfully discharge her duties as she did not perform an independent investigation of the family. At the permanent custody hearing, Ms. Peterman did not object to the guardian ad litem's testimony and the admission of her report. Additionally, Ms. Peterman did not raise the issue of the guardian ad litem's professional performance in this case.
This court has held that "[a] fundamental rule of appellate review is that an appellate court will not consider any error that could have been, but was not, brought to the trial court's attention." Little Forest Med. Ctr. of Akron v. Ohio Civ. RightsComm. (1993), 91 Ohio App.3d 76, 80. "Thus, a party has waived the right to appeal an issue that was in existence prior to or at the time of trial if that party did not raise the issue at the appropriate time in the court below." Id. We find that as Ms. Peterman did not raise this issue before the trial court, she has waived any error on these issues on appeal. Ms. Peterman's sixth assignment of error is overruled.
 2. Fourth Assignment of Error CHILDREN SERVICES BOARD DID NOT USE REASONABLE AND DILIGENT EFFORTS TO REUNIFY THE FAMILY.
 Seventh Assignment of Error WHETHER CHILDREN SERVICES BOARD VIOLATED APPELLANT'S FIFTH AMENDMENT RIGHT BY SEEKING PERMANENT CUSTODY OF HER SON BECAUSE SHE REFUSED TO ADMIT TO CHILD ENDANGERING IN THAT THE FATHER WOULD SEXUALLY ABUSE THEIR SON.
Ms. Peterman combines these two assignments of error in her brief. In these assignments of error, Ms. Peterman asserts that CSB did not put forth reasonable and diligent efforts to reunite the family, as the focus of CSB's efforts, including the case plan, was to have the parents admit that Mr. Creel was a threat to their son. She argues that this violated her right to be free from compulsory self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution because CSB sought permanent custody of her son after she refused to admit that Mr. Creel was a potential danger to Robert. We disagree.
 The Fifth Amendment to the United States Constitution provides in pertinent part that no person "shall be compelled in any criminal case to be a witness against himself." This protection exists primarily to "assure that an individual is not compelled to produce evidence which may later be used against him as an accused in a criminal action." The protection [afforded by] this amendment applies in any type of proceeding, whether civil, criminal, administrative, investigatory, or adjudicatory.
(Citations omitted.) Cincinnati v. Bawtenheimer (1992),63 Ohio St.3d 260, 264. The availability of the privilege turns upon whether the statement or admission is or may be inculpatory. In re Gault (1967), 387 U.S. 1, 49,18 L.Ed.2d 527, 558.
Here, Ms. Peterman argues that while she testified under oath and insisted throughout her interaction with CSB that she did not believe Robert was at risk from Mr. Creel, she does not want her position to be used against her in determining the permanent custody award. Ms. Peterman's statements on this matter do not subject her to potential criminal prosecution; therefore, theFifth Amendment privilege against compulsory self-incrimination is not implicated. Ms. Peterman's fourth and seventh assignments of error are overruled.
 C. Mr. Creel's Remaining Assignments of Error 1. First Assignment of Error MR. CREEL'S RIGHT NOT TO BE PUT IN PERIL TWICE FOR THE SAME OFFENSE AS GUARANTEED BY THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION WAS VIOLATED WHEN HIS PARENTAL RIGHTS AND RESPONSIBILITIES WERE TERMINATED BECAUSE OF HIS PREVIOUS ATTEMPTED RAPE CONVICTION.
In his first assignment of error, Mr. Creel argues that the award of permanent custody to CSB based on his prior conviction for attempted rape is a multiple punishment for the same offense, and therefore, violates the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. We disagree.
The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The Fifth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment to the United States Constitution.State v. Tolbert (1991), 60 Ohio St.3d 89, 90. Article I, Section 10 of the Ohio Constitution contains similar language, stating that "[n]o person shall be twice put in jeopardy for the same offense."
"The Double Jeopardy Clauses of the Ohio and United States Constitutions prohibit subsequent prosecution for the same offense after acquittal or conviction as well as multiple punishments for the same offense." State v. Vasquez (1997), 122 Ohio App.3d 692,694. In analyzing an alleged double jeopardy violation based on multiple punishments for the same offense, "[t]he threshold question * * * is whether the government's conduct involves criminal punishment." State v. Williams (2000), 88 Ohio St.3d 513, 528. Hence, we must determine whether the decision to grant permanent custody to CSB based, in part, on Mr. Creel's prior attempted rape conviction constituted a punishment for double jeopardy purposes.
In the present case, the permanent custody award to CSB was not in the nature of a criminal penalty against Mr. Creel for his prior conviction, but rather was based on the general welfare of his child and Mr. Creel's ability to properly care for him. See, generally, State v. Hoff (Aug. 16, 1999), Perry App. No. 99- CA-7, unreported, 1999 Ohio App. LEXIS 3871, at *2-3. One of the stated purposes of R.C. 2151 et seq. is "[t]o provide for the care, protection, and mental and physical development of children." R.C. 2151.01(A). Further, contrary to Mr. Creel's assertion, his parental rights were not terminated solely on the basis of his past criminal conviction for attempted rape, but rather, due to his unwillingness to obtain treatment for both sexual behavior and substance abuse. Consequently, we find that the juvenile court's decision to terminate Mr. Creel's parental rights did not constitute punishment for double jeopardy purposes, and therefore, does not violate the Double Jeopardy Clauses of the United States and Ohio Constitutions. Mr. Creel's first assignment of error is overruled.
 2. Second Assignment of Error THE TRIAL COURT ERRED IN QUALIFYING DR. ZOOK AS AN EXPERT WITNESS WITHOUT PROPER FOUNDATION, AND IN PERMITTING HIM TO GIVE EXPERT OPINION TESTIMONY EVEN THOUGH HIS TESTIMONY DID NOT RISE TO THE LEVEL OF A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY.
 THE TRIAL COURT ERRED IN ALLOWING DR. ZOOK TO TESTIFY WITHOUT MANDATING THAT HIS TESTIMONY BE SUBSTANTIATED OR VALIDATED BY ANY SCIENTIFIC DATA OR RESEARCH.
In his second assignment of error, Mr. Creel avers that the juvenile court erred in qualifying Dr. Zook as an expert witness without the proper foundation. He further asserts that it was error to allow Dr. Zook to render expert opinions, specifically that Mr. Creel was a moderate to high risk of reoffending, even though his testimony did not rise to the level of a reasonable degree of scientific certainty and was not substantiated by any scientific data or research. We disagree.
Pursuant to Evid.R. 104(A), the juvenile court must make a threshold determination regarding the qualification of a person to be an expert witness, before it permits expert testimony. SeeScott v. Yates (1994), 71 Ohio St.3d 219, 221. "To qualify as an expert, the witness need not be the best witness on the subject[; however,] [t]he expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror." (Citation omitted.) Id. "A ruling concerning the admission of expert testimony is within the broad discretion of the [juvenile] court and will not be disturbed absent an abuse of discretion." Id.; see, also, In re Webb (1989), 64 Ohio App.3d 280,286. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio StateMed. Bd. (1993), 66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the court below. Id.
Evid.R. 702 governs the admission of expert testimony and states:
 A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
In the present case, Mr. Creel argues that Dr. Zook was not qualified as an expert in this case. However, Dr. Zook, a licensed psychologist at Portage Path Behavioral Health, testified that he received a Ph.D. in counseling psychology from the University of Akron. He further stated that his main area of expertise at Portage Path Behavioral Health is working with adults who sexually offend against children. He testified that he has worked at Portage Path Behavioral Health since 1988, and the sexual offender program began in 1989. After carefully reviewing Dr. Zook's credentials, we cannot say that the juvenile court abused its discretion in determining that Dr. Zook was qualified as an expert in this case.
Next, Mr. Creel contends that the juvenile court erred in allowing Dr. Zook to render expert opinions; specifically, Mr. Creel argues that Dr. Zook's testimony that he was at a moderate to high risk of reoffending was inadmissible because it did not rise to the level of a reasonable degree of scientific certainty and was not substantiated by any scientific data or research. However, Dr. Zook testified that he considered eight factors in determining whether Mr. Creel was at a moderate to high risk of reoffending. He also explained that research in the field suggests that certain behaviors, as partly reflected in the aforementioned eight factors, indicate a high risk of recidivism. Consequently, we conclude that the trial court did not err in admitting Dr. Zook's expert testimony. Mr. Creel's second assignment of error is overruled.
 3. Fourth Assignment of Error THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL; SPECIFICALLY (1) APPELLANT'S COUNSEL WAS INEFFECTIVE BY AGREEING TO THE CONTINUATION OF THE TRIAL AFTER THE JUDGE DECLARED A MISTRIAL AND AFTER THE TESTIMONY OF DR. ZOOK WAS DEEMED ADMISSIBLE. (2) APPELLANT'S COUNSEL WAS INEFFECTIVE BY FAILING TO FILE A MOTION OBJECTING TO THE ADMISSION OF DR. ZOOK'S TESTIMONY.
In his final assignment of error, Mr. Creel avers that he was denied the effective assistance of trial counsel. He argues that his trial counsel's performance was deficient in that his counsel agreed to continue with the hearing, via a motion for reconsideration filed jointly by all parties, after the juvenile court declared a mistrial based in part on Dr. Zook's testimony. Mr. Creel further asserts his trial counsel was ineffective for failing to file a motion objecting to the admission of Dr. Zook's testimony. We disagree.
In reviewing ineffective assistance of counsel claims, this court will apply the same standard in permanent custody cases as that applied in criminal cases. In re Rackley (July 16, 1997), Summit App. No. 18139, unreported, at 5. Thus, a successful ineffective assistance of counsel claim requires a showing that counsel's performance has "fallen below an objective standard of reasonable representation" and that prejudice arose from counsel's deficient performance. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. "To show that [an individual] has been prejudiced by counsel's deficient performance, [the individual] must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.
In the case at bar, Mr. Creel argues that he was denied the effective assistance of counsel when his counsel allowed the juvenile court to continue with the presentation of evidence after a mistrial was declared, which was based in part on Dr. Zook's testimony. As previously discussed, Dr. Zook's expert testimony was admissible, and the juvenile court did not err in permitting Dr. Zook to testify. Therefore, we conclude that counsel's performance, in assenting to continue the hearing and in not filing a motion objecting to the admission of Dr. Zook's testimony, was neither deficient nor prejudicial to Mr. Creel. Accordingly, Mr. Creel's fourth assignment of error is overruled.
 III.
Appellants' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants.
Exceptions.
 ___________________________ WILLIAM G. BATCHELDER
FOR THE COURT, SLABY, J., WHITMORE, J., CONCUR.
[1] Ms. Peterman and Mr. Creel filed separate appeals. In a journal entry dated May 18, 2000, these appeals (Summit App. Nos. 20066 and 20074) were consolidated.
[2] He admitted to being fired from Wal-Mart due to his drinking. Mr. Creel currently works for a grocery store and earns approximately $100 per week.